**Michael NAREZ, Plaintiff,**

v.

**General L. WILSON and Captain J. J. Dudash, Defendants.**

**No. 76–1110C(B).**

United States District Court,
E. D. Missouri, E. D.

Feb. 22, 1977.

Francis L. Ruppert, Clayton, Mo., for plaintiff.

Joseph B. Moore, St. Louis, Mo., for defendants.

## MEMORANDUM

REGAN, District Judge.

Plaintiff, an enlisted member of the United States Marine Corps Reserve, brought this action to prevent the Corps from implementing its orders requiring him to report for involuntary active duty. By consent, a temporary restraining order has been continued in effect pending the determination of the cause. Defendants have moved for summary judgment.

Plaintiff enlisted in the Reserve on April 18, 1971 for a period of six years. At that time he signed an enlistment contract and a "Statement of Understanding" whereby he acknowledged, inter alia, that he was obligated to attend 48 scheduled drills and not to exceed 17 days of active duty for training each year of his enlistment following his initial 6 month period of active duty for training. Plaintiff also acknowledged therein his obligation to keep his Commanding Officers informed of his current address at all times.

On November 1, 1976, plaintiff was called to active duty effective November 30, 1976, based on the Marine Corps determination of his "unsatisfactory participation in Reserve Training" by failing to attend scheduled drills. Admittedly, plaintiff had failed to attend or to report for any of his training drills since January 4, 1976. Not only were these absences not excused, but plaintiff, with actual knowledge of his obligation to report for such drills, intentionally and advisedly refrained from doing so.

With this background statement, we consider the facts and law applicable to plaintiff's complaint. Therein plaintiff alleges that the order to involuntary active duty was wrongfully issued solely as punishment and retaliation for plaintiff's failure to accede to respondents "arbitrary" refusal to permit him to perform his prescribed duties while wearing a wig, even though the wig actually conformed to Marine Corps regulations.

For purposes of the motion for summary judgment we accept as facts the following: In November, 1973, plaintiff (joined by other reservists) was a party-plaintiff in a suit challenging the then policy of the Marine Corps banning the use by reservists of short-hair wigs to cover their long natural hair for the purpose of avoiding cutting their hair in order to comply with Marine Corps grooming standards. On December 19, 1973, the Court of Appeals for the Eighth Circuit in another case, *Miller v. Ackerman*, 488 F.2d 920, sustained orders of a district court which enjoined the implementation of the Corps' wig policy insofar as it applied to the reservists' weekend training programs, basing its holding upon the uncontradicted evidence in that case that the wigs in question were neat and presentable and otherwise conformed to the grooming code.

Following that decision (and a change in the Marine Corps policy) plaintiff (and most other reservists in his company) wore wigs to weekend drills without incident until March, 1975. However, on three occasions in March, 1975, Captain Dudash (who had become commanding officer of Company I, to which plaintiff was assigned) informed plaintiff that by reason of the wig he wore, plaintiff did not conform to Dudash's own grooming standards, and on that ground marked each of plaintiff's March, 1975 drills as "unsatisfactory" even after (according to plaintiff) plaintiff had twice cut the wig in an attempt to placate the Captain. At the next month's drill, plaintiff was told by Dudash that unless he got rid of his wig and cut his natural hair, he (Dudash) would try to activate plaintiff as well as the other reservists (comprising about 80% of the entire company) who continued to wear wigs.

Following this statement, plaintiff voluntarily and intentionally (and aware of the possible consequences) determined to (and did) absent himself from any drill sessions for seven consecutive months commencing in May, and inclusive of November, 1975, missing a total of 27 scheduled drills. Make-up drills for the absences were authorized, but these too were not performed. In addition, plaintiff failed to appear in July, 1975 for his required two weeks of active

duty at summer camp. He did, however, attend and was given credit for five drill sessions on December 5, 6 and 7, 1975.

The official record shows that on December 5, plaintiff was counseled on the mandatory participation requirement and directed to perform the August, 1975 make-up drills on December 11, 12, 15, 16, 17, 29 and 30. He failed to report on December 11, but did report on December 12, at which time "his appearance was unsatisfactory (Haircut and not in uniform)" and was counseled on grooming standards as well as participation requirements. He was then advised that the remaining December make-up drills could not be performed unless his appearance was satisfactory and that if they were not performed he would be recommended for involuntary active duty.

The record further shows that plaintiff next reported for the January 3–4, 1976 drills at which his attendance was rated "unsatisfactory" by Captain Dudash "for failure to comply with Marine Corps grooming standards" although (according to plaintiff) his wig was cut to the Corps' standards. Following twelve subsequent unexcused absences in February, March and April, 1975, Major W. L. Hughes, the commanding officer of Headquarters Service Company,[1] sent a letter to plaintiff by registered mail No. 1691 under date of April 28, 1976, setting forth Hughes' intent to recommend that plaintiff "be assigned to involuntary active duty because of [plaintiff's] unsatisfactory participation in prescribed training." The April 28 letter of "intent" was mailed to plaintiff at his last known address, 7919 Elton, but was returned "unclaimed," although the Postal Service had left a notice thereof at that address.

Theretofore, under date of March 9, 1976, Captain Gaither, who was then commanding officer of Company I, notified plaintiff by a registered letter, No. 1655, of Gaither's

intent to recommend his discharge from the Reserve by reason of unfitness on the basis of "an established pattern of shirking." Thereby, plaintiff was advised of various rights in the event of such recommendation, including his right to have his case considered by an administrative discharge board before which he could appear with counsel and present evidence and statements on his behalf. This letter was received on March 11, 1976, and plaintiff timely advised the Corps of his desire to exercise his rights. However, no follow-up action was taken on the letter of intent, and Captain Gaither never made the recommendation that plaintiff be discharged. As the result, no administrative discharge board was convened.

On June 4, 1976, Major Hughes sought to notify plaintiff by registered mail No. 1718 of his intention to recommend that plaintiff be administratively reduced from private first class to the rank of private due to his unsatisfactory drill performance. By mistake, the notice was mailed to plaintiff at 7917 instead of 7919 Elton, the correct address, and the letter was returned to Hughes with the notation that the addressee had moved without leaving a forwarding address.

On September 8, 1976, another copy of the April 28, 1976 notice of Major Hughes' intent to recommend plaintiff be assigned to involuntary duty was mailed to plaintiff at his 7919 Elton address by registered mail No. 1869, and it too was returned "unclaimed" after two notices thereof were left at the Elton address. Two other copies of the notice of intent were sent to different (but erroneous) addresses.

Thereafter, the November 1, 1976 orders assigning plaintiff to involuntary active duty were issued. After they were received in St. Louis (about 5 or 6 days later) the Corps began a series of efforts to locate plaintiff by telephone, and on November 12, 1976, he was located at his place of employ-

---

1. As of March 30, 1976, Company I was "redesignated," and about 40 of the complement of less than 90 reservists, including plaintiff, were transferred to the Headquarters Service Company commanded by Major Hughes and the remaining men remained in new Detachment Company M under Captain W. C. Gaither. It is questionable whether plaintiff knew of the transfer, in light of his failure to attend any drills, and in particular the drills at which the transfers were announced.

ment and informed of his orders. Plaintiff then stated he wished to contest the orders and would appear for that purpose on November 20. Instead, he authorized an attorney to review his records, which was done on November 19. On November 29, 1976, the orders to report were personally delivered to plaintiff at his place of employment. Plaintiff failed to report on November 30 and filed this suit the following day. It had been prepared and signed by him a week earlier.

Section 673a, 10 U.S.C. authorizes the military to call to active duty (for a total service of 24 months) a reservist who is not participating satisfactorily in a unit of the reserve. In *Dix v. Rollins*, 8 Cir. 1969, 413 F.2d 711, 715, it is stated that "(t)he power of the President and his authorized representatives to call individual reservists and reserve units to active duty has been uniformly liberally construed."

■ Although purely discretionary decisions by the military are not reviewable by the courts (Cf. *Orloff v. Willoughby*, 1953, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842), we do have the power to examine a reservist's involuntary activation to determine whether his procedural rights under the military's applicable regulations were violated in a manner causing him substantial prejudice. See *Smith v. Resor*, 2 Cir., 1969, 406 F.2d 141, 145.

The complaint alleges (1) that the Marine Corps declared plaintiff an unsatisfactory participant and ordered him to involuntary active duty in retaliation for exercising his right to wear a wig at his weekend Reserve duties, even though the wig conformed to Marine Corps regulations, and (2) that by refusing to process his appeal from the "recommendation" of an undesirable discharge and instead ordering plaintiff to involuntary active duty, his rights to due process were violated.

■ In essence, plaintiff alleges that his activation was ordered for a purely punitive purpose. Having examined the record, including the depositions and plaintiff's affidavit, we find no factual basis upon which we could so rule. To the contrary, it is evident that plaintiff would not have been activated but for his intentional, unexcused, pattern of absenteeism. Of importance is the fact that he was not called to active duty because of the subjective judgment of Captain Dudash or other officer relating to plaintiff's performance while at drill. There were only 5 occasions (a total of 8 drills) at which plaintiff's performance while present at drill was rated "unsatisfactory" because of the view Captain Dudash took of plaintiff's hairgrooming and dress.

On all other occasions at which plaintiff received "unsatisfactory" ratings, he had simply absented himself. This was the case in May, June, July, August, September, October and November, 1975, both as to the required weekend drills and the two week summer camp active duty. Then, without explanation, plaintiff appeared for the regular December, 1975 drills (for which he received credit) and for the January, 1976 drills at which Captain Dudash gave him 3 "unsatisfactory" ratings on the ground that "the wig didn't meet 'his standards'" (Plaintiff's affidavit). Then, in the words of plaintiff, "(a)t that point I decided to stop going to drills, because I was afraid that the Marines would write to (my employer) and tell them that I was a troublemaker at the drills, and I would be fired."

Plaintiff's decision to "stop going to drills" was made after he had been counseled on several occasions on the mandatory participation requirement and in spite of his full awareness of the consequences. Admittedly, plaintiff's "fear" that his employer would be notified he was a "trouble maker" was purely subjective and not based on any statement by Dudash or other officer. Had plaintiff actually attended the mandatory or make-up drills and on each occasion been rated "unsatisfactory" and marked absent for reasons relating to the wigs he wore, an entirely different situation would be presented. However, his intentional, continued, absences left the Corps with no alternative but to take one of the two courses available to it: involuntary activation or undesirable discharge.

The best course to follow in a particular case is a matter of military discretion. It must not be overlooked that a recommendation of an undesirable discharge is ordinari-

ly made only when the reservist is considered on the basis of his record as a reservist to be unqualified for active duty. In this case, plaintiff's record shows that he performed adequately (or above average in some instances) when he attended the drills, so that there was a reasonable basis for belief that he would do at least fairly well on active duty. That is, in the words of Captain Anderson, plaintiff was considered "salvageable," so that activation was to be preferred over an undesirable discharge.

■ It is, of course, true that a letter of intent to recommend plaintiff for a discharge was sent to him by Captain Gaither on March 9. However, the recommendation itself was never made, either by Captain Gaither or by Major Landis, plaintiff's commanding officer, so that there was no basis for the implementation of any of the rights and procedures which would have been applicable in the event of such a recommendation. The fact that the Corps reconsidered the wisdom of making the recommendation is irrelevant.

Although not pleaded, the major issue briefed and argued by the parties concerns the question of whether plaintiff was prejudiced by the failure of the Corps to strictly follow all of its applicable regulations. One of such regulations (Dist. O 1571R.17D) requires the Corps to notify a reservist by mail of each and every unexcused absence. Plaintiff's service record states that notices concerning his absences were sent to plaintiff on several occasions. In addition, as stated supra, plaintiff was counseled about the mandatory necessity for his participation on May 12, 1974, June 30, 1974, December 5, 1975 and December 12, 1975.

■ The routine notices provided for by the regulation could not have more fully informed plaintiff of what he already knew. This is particularly true in light of the admitted fact that plaintiff's failures to attend drill sessions resulted from his own deliberate decision to absent himself therefrom rather than by reason of illness or other cogent excuse. Under the admitted and undisputed facts, the failure of the Corps to notify plaintiff of each of his absences and unsatisfactory performance by

reason thereof could not have been prejudicial to him.

■ Plaintiff argues that the Corps should have done more than simply mail the notice of intention to recommend involuntary activation, contending that it should have sought him out in person as it ultimately did to effect service of the orders to report for duty. The regulation does not so mandate. It is obvious that for the purpose of serving the actual orders activating plaintiff, personal contact was essential. Hence, the fact that such was done in November, 1976, has no bearing upon the right of the Corps to rely on registered mail to notify plaintiff of the intended recommendation, particularly since it was returned "unclaimed."

■ As of April 28, 1976, plaintiff's address of record was still 7919 Elton. He testified in his deposition that his address remained 7919 Elton until he and the friend with whom he shared the apartment left it in November, 1976. He testified, however, that beginning in February, 1976 he actually resided with his parents at 2915–B Chippewa, but that he still considered his address (certainly so for mailing purposes) to be 7919 Elton (and never notified the Corps to the contrary). It was to *that* address the April 28, 1976 letter was *twice* sent (in April and September) by registered mail. The Corps is not to be faulted by plaintiff's failure to claim the letter, or (if so) by the failure of plaintiff's Elton roommate to inform plaintiff of the postal service's notice of the attempted delivery. At the very least plaintiff was on constructive notice of the letter of intent.

■ Plaintiff calls our attention to a "letter" found in plaintiff's official military file which states that plaintiff reported for assignment on November 30, 1976 and was found to be physically qualified. This letter was actually and prematurely prepared in early November, apparently in anticipation that plaintiff would obey the orders and be found physically fit. It has no relevance to the issues in this case. Insofar as the orders which were delivered to plaintiff on November 29, 1976 are concerned, plaintiff was directed to report on November 30,

1976 for a complete physical examination to determine whether he was qualified for active duty. We do not countenance the Corps' advance assumption that plaintiff would be found qualified, but find plaintiff was not in the least prejudiced thereby.

Having determined there is no genuine issue of material fact, it follows that defendants are entitled to summary judgment and that defendants' motion therefor should be and it is hereby SUSTAINED.