Michael NAREZ, Appellant,

v.

General L. WILSON and Captain J. J. Dudash, Appellees.

No. 78–1375.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 17, 1978.

Decided Jan. 24, 1979.

Francis L. Ruppert, Clayton, Mo., on brief, for appellant.

Joseph Moore, Asst. U. S. Atty., St. Louis, Mo., for appellees; Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on brief.

Before STEPHENSON and McMILLIAN, Circuit Judges, and ROBINSON,* Senior District JUDGE.

STEPHENSON, Circuit Judge.

Plaintiff-appellant Michael C. Narez appeals from the trial court's [1] grant of summary judgment to the defendant-appellees, United States Marine Corps.[2] Inasmuch as the record reveals yet to be resolved issues of material fact, we reverse and remand to the trial court for proceedings not inconsistent with this opinion.

In stating the facts relevant to the appeal, we will adhere to the standards established for summary judgment:

Where several possible inferences can be drawn from the facts contained in the affidavits, attached exhibits, pleadings, depositions, answers to interrogatories, and admissions on file, "[o]n summary

---

* The Honorable Richard E. Robinson, Senior United States District Judge for the District of Nebraska, sitting by designation.

1. The Honorable John K. Regan, Senior United States District Judge for the Eastern District of Missouri.

2. General L. Wilson and Captain J. J. Dudash are the named defendants in this case. *Narez v. Wilson,* 449 F.Supp. 141 (E.D.Mo.1977).

judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion."

*City Nat'l Bank v. Vanderboom*, 422 F.2d 221, 223 (8th Cir.) *cert. denied*, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970), *quoting from United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

Narez enlisted in the Reserve Marine Corps on April 18, 1971, for a period of six years. When he enlisted, he signed an enlistment contract by which he acknowledged his obligation to attend weekend drills and an annual active duty summer camp. As a part of this agreement, Narez also assumed the responsibility of informing the military of his current address.

From the time of his enlistment until March 1975, Narez presumably satisfactorily fulfilled his military obligations. In the weekend drill of March 1975, however, the commanding officer of Narez' Company, Captain Dudash, designated Narez as an "unsatisfactory" participant in each drill.[3] The apparent reason for the unsatisfactory designation was that Narez' wig, although allegedly in compliance with Corps standards, did not conform to Dudash's grooming standards. The unsatisfactory rating continued even after Narez had twice cut the wig (between the Saturday morning and Saturday afternoon drills and prior to

the Sunday morning drill) in an attempt to conform to Dudash's expectations.[4]

Relevant to this appeal is the fact that in November 1973 Narez was a plaintiff in a suit brought to challenge the then-existing policy of the Marine Corps which did not allow reservists to wear short hair wigs to cover their own longer hair. On December 19, 1973, this court affirmed a district court order enjoining the implementation of the no-wig policy insofar as it applied to weekend reservists. *Miller v. Ackerman*, 488 F.2d 920 (8th Cir. 1973). In particular we said:

> [W]e find no rational basis for the proscription of short-hair wigs and [affirm the district court's order, *Klinkhammer v. Richardson*, 359 F.Supp. 67 (D.Minn. 1973)] enjoining any proscription of the use of short-hair wigs in the reservists' weekend training program.

*Miller v. Ackerman, supra*, 488 F.2d at 922.

The Marine Corps consequently changed its policy to conform to the district court's order and allowed, subject to regulations, the wearing of wigs by reservists on drill weekends.

Narez appeared at the next regularly scheduled drill in April 1975;[5] at that time Dudash allegedly told Narez that unless he got rid of his wig and cut his natural hair, Dudash would "activate" him to involuntary active duty.[6]

---

**3.** An unsatisfactory rating is essentially equivalent to an absence from the drill.

**4.** Narez states in his affidavit:

During the morning formation at the drill weekend on March 22, 1975, Captain Dudash, the inspecting officer, told me that my wig was not cut satisfactorily, and he gave me an unsatisfactory performance. Although the wig was cut satisfactorily, I had it cut using a ruler to conform to his demands, but at 1:00 that afternoon, I was inspected again, and told that my wig was still unsatisfactory. When I told him that it met Marine Corps standards, he said, "I don't care what you did to it, it still doesn't meet my standards." He gave me another unsatisfactory drill. That gave me two unsatisfactories for the weekend. I took the wig home on Saturday night and cut it again. On Sunday, March 23, 1975, I went back to the next day's drill. Captain Dudash again told me that

my wig cut was unsatisfactory, and he gave me an unsatisfactory rating for the drill. I told him, "I cut the wig as much as I possibly can, the band is almost visible," and Captain Dudash then replied, "Yes, I can see that you did, but now it is too messy, even though it is short enough." When I asked him what I could do to meet his standards, he said, "I'm not telling you anything, it was your problem when you started wearing the wig."

**5.** Narez missed the Saturday drill because of car trouble; Dudash excused that absence.

**6.** Narez states in his affidavit:

Captain Dudash said, "Narez, you know I was given a choice of either straightening out this company or stepping down. You know I believe in the Reserve program, so instead of stepping down, I'm going to stay. I have been told either to get rid of those people who wear

Narez also contends that at both the March and April 1975 drills, he requested of Dudash to be allowed to appear for MAST, but was never permitted such. MAST is an internal informal Corps procedure by which an enlisted Marine reservist who wishes to lodge a complaint against a superior officer or non-commissioned officer may request the right to appear before that officer's or non-commissioned officer's commanding officer to discuss the complaint.

Narez' record shows that Narez did not appear for the next seven months of drills, nor did he appear for his required two weeks of active duty in July. In December 1975, Narez finally reappeared at drill and was given credit for the drills on December 5, 6 and 7; the record shows that he was counseled on December 5 concerning mandatory participation and makeup drills. Narez' makeup drills were scheduled for December 11, 12, 15, 16, 17, 29 and 30. He did not report on the 11th; he reported on the 12th, at which time his performance was rated "unsatisfactory" as he was not in uniform and his hair did not adequately conform to the requirements. Narez was told he could not do his makeup drills unless his appearance was satisfactory; he was also warned that if the makeup drills were not performed, he would be recommended for involuntary active duty.

Narez appeared for the January 1976 drills, wearing a new wig which he contends conformed with Marine Corps standards. Dudash again marked Narez as an "unsatisfactory" participant on the basis that—according to Narez—the wig did not meet "Dudash's standards." At that time, Narez decided not to attend any future drills,[7] and he was not present for the February, March and April 1976 drills.

During the next few months, several letters were written by Marine officials and sent to Narez explaining what action the Corps was going to take against him. All but one of these letters failed to reach Narez, however, and the Corps maintains Narez was the cause of this failure inasmuch as he had not kept the Marines advised of his most current address.[8]

The letter that Narez received was sent March 9, 1976, received March 11, 1976, and advised Narez of the Marines' intent to recommend his discharge on the basis of "an established pattern of shirking." On March 15, pursuant to the choices outlined in the Marines' letter, Narez wrote back, stating that he did not wish to accept the discharge and requesting to have his case be considered[9] by an administrative discharge board. The Marines never replied to Narez'

wigs by activating them or by having them take off their wigs and getting their hair cut." I said, "Sir, I have never heard of an individual being activated for not having a haircut," and Captain Dudash replied, "I know that it's never been done, and I don't know if it can be done, but I will try, which brings me to you. I am going to use you as an example, either get rid of your wig and get a haircut, or I will find some way of activating you." I said, "Sir, it sounds to me like you are making a scapegoat out of me," and Captain Dudash replied, "You can call it what you want, but I want you to go out and tell the other troops what I said." I did as he told me * * *.

7. Narez states in his affidavit:
   During the January, 1976 drill, I was inspected by Captain Dudash. I was wearing a new wig which I had cut to Marine Corps standards. Captain Dudash gave me three unsatisfactory drills for that weekend, because, according to him, the wig didn't meet "his standards." * * * [A]fter I had received my third unsatisfactory, I went to talk to Captain Dudash. I said, "Captain, I have

tried to conform to your grooming standards, but I don't know what more to do." Captain Dudash replied, "Narez, I don't see any way or anything you can do that you can measure up to my standards. Every time you come out here, you'll be given an unsatisfactory drill." I said, "Captain, I work at Monsanto, and they do not pay us for weekend drills. I'm losing two days' pay every weekend from work, and you do not pay me out here because you give me an unsatisfactory performance." (Reservists are not paid when they are given unsatisfactories for the drills, even though they may spend the full time at the drill). Captain Dudash replied, "That is your tough luck." At that point, I decided to stop going to drills, because I was afraid that the Marines would write to Monsanto and tell them that I was a troublemaker at the drills, and I would be fired.

8. Narez moved approximately four times during his career with the Reserve.

9. Narez' letter states:
   I do not wave any rites. I have not ever had the oppertunity to present my case before

March 15 letter and did not pursue the plans to discharge him. Instead, on April 28, 1976, the Corps sent to Narez a notice of its intent to recommend that Narez be ordered to involuntary active duty (for which there is no provision for review by an administrative board);[10] on June 4, 1976, sent to Narez a notice of intent to recommend that he be administratively reduced to the rank of private; and on September 8, 1976, sent to Narez a second letter of intent to recommend that he be recommended for involuntary active duty. None of these letters ever reached Narez, and they were returned, marked "Unclaimed" or "Moved."

On November 1, 1976, Narez' order of assignment to involuntary active duty, effective November 30, was issued, and the Corps began a series of efforts to locate Narez by telephone. On November 12, 1976, the Corps located Narez at his place of employment and informed him of the order. Narez said that he wished to contest the order and stated that he would appear for that purpose on November 20, 1976. Narez authorized an attorney to review Narez' records on November 19, 1976, but Narez did not appear on November 20. On November 29, Narez' orders to report were personally delivered to him at his place of work, and on November 30, Narez failed to report as ordered.

Narez raises three primary issues on appeal. The only one necessary for us to discuss here is his contention that the pleadings, affidavits and depositions of the parties raise a genuine issue of material fact as to whether Narez was ordered to involuntary active duty, directly or indirectly, as a result of his wearing a regulation wig to weekend drills.

In a summary judgment situation, the court may consider admissions and facts conclusively established but all reasonable doubts touching the existence of a genuine issue as to material fact must be resolved against the movant.

\* \* \* \* \* \*

"A summary judgment upon motion therefor by a defendant in an action should never be entered except where the defendant is entitled to its allowance beyond all doubt. To warrant its entry the facts conceded by the plaintiff, or demonstrated beyond reasonable question to exist, should show the right of the defendant to a judgment with such clarity as to leave no room for controversy, and they should show affirmatively that the plaintiff would not be entitled to recover under any discernible circumstances. \* \* \* A summary judgment is an extreme remedy, and, under the rule, should be awarded only when the truth is quite clear. \* \* \* And all reasonable doubts touching the existence of a genuine issue as to a material fact must be resolved against the party moving for summary judgment."

*United States v. Farmers Mut. Ins.*, 288 F.2d 560, 562 (8th Cir. 1961), *quoting from Traylor v. Black, Sivalls & Bryson, Inc.*, 189 F.2d 213, 216 (8th Cir. 1951). *See Goodman v. Parwatikar*, 570 F.2d 801, 803 (8th Cir. 1978); *City Nat'l Bank v. Vanderboom, supra*, 422 F.2d at 223.

If, by reasonable inference from the facts, it could be concluded that by action of the Corps Narez was denied his constitutionally protected right to govern his personal appearance, directly or indirectly in violation of our decision in *Miller v. Ackerman, supra*, then the Corps, as the moving party, has failed to sustain its burden, and the order of summary judgment must be reversed.

you. I do not except a undesirable discharge. I desire the rite to discuss my case with the proper officials in this mater. I feel it only nessecary to tell you that I have been a victim of circumstance which was bestowed upon me by Captain J. Dudash Co. of Company I in a drill in April of 1975. Upon when I was verbally harassed. I am sure I can come up with a proper case or witnesses if necesary. I have been a particapant with Co. I for 4½ years of continues service without any blemishes on my record at all. So in last stating I do here by ask you to grant me at least a meeting with the right officialls. In accordance with my case or I will have to write my Congressman.

10. The reservist may respond with a statement, however.

The issue is a material one in that it goes to the heart of Narez' pleading; and a review of the record also discloses that there are sufficient facts that give rise to the inference that Narez suggests: (1) Narez' claim that he was marked unsatisfactory because of his wig, when Narez contends his wig conformed to Corps requirements; (2) the allegations that Dudash told Narez to get rid of his wig or Narez would be activated; (3) the Corps' change of recommendation from discharge (of which there is a review by an administrative board) to involuntary active duty (for which a review by an administrative board does not exist); (4) the fact that Narez claims he at least twice requested MAST, but did not receive it; and (5) the delay in the orders to activate Narez (Narez was absent from drills in May, June, July, August, September, October and November, 1975, and yet the Corps' notification to Narez of discharge or involuntary active duty did not come about until after the further dispute Narez had with Dudash over Narez' wig in January 1976).[11] We do not list these factors as a comment upon the strength or weakness of Narez' case; we only point to these facts to illustrate that a reasonable inference can be drawn from these facts favorably for Narez.[12]

Thus, for the reason that a genuine issue as to a material fact exists in this case, we hold that this case is not an appropriate one for summary judgment. The purpose of summary judgment "is not to cut litigants off from their right of trial * * * if they really have evidence which they will offer on a trial[;] it is to carefully test this out, in advance of trial by inquiring and determining whether such evidence exists." *Whitaker v. Coleman*, 115 F.2d 305, 307 (5th Cir. 1940).

We reverse and remand for proceedings not inconsistent with this opinion.

---

**11.** We note that there appear to be other "facts" perhaps not fully aired, i. e., whether the Corps followed its own regulations in its transactions with Narez, and the impact of those possible failures on the immediate situation.

**12.** We specifically refrain from commenting upon the extent of military discretion or the scope of review of military actions by the court. We duly note:

(a) Notwithstanding any other provision of law, the President may order to active duty any member of the Ready Reserve of an armed force who—

(1) is not assigned to, or participating satisfactorily in, a unit of the Ready Reserve;

(2) has not fulfilled his statutory reserve obligation; and

(3) has not served on active duty for a total of 24 months.

(b) A member who is ordered to active duty under this section may be required to serve on active duty until his total service on active duty equals 24 months. If his enlistment or other period of military service would expire before he has served the required period under this section, it may be extended until he has served the required period.

(c) To achieve fair treatment among members of the Ready Reserve who are being considered for active duty under this section, appropriate consideration shall be given to—

(1) family responsibilities; and

(2) employment necessary to maintain the national health, safety, or interest.

10 U.S.C. § 673a.

A case factually similar to the instant case is *Baugh v. Bennett*, 329 F.Supp. 20 (D.Idaho 1971), and *Baugh v. Bennett*, 350 F.Supp. 1248 (D.Idaho 1972), *affirmed mem.*, 547 F.2d 1174 (9th Cir. 1976).