Clem ALEXANDER, Jr., Respondent,

v.

JOHNSON FURNACE COMPANY, Appellant.

No. KCD 27725.

Missouri Court of Appeals, Kansas City District.

Nov. 1, 1976.

Alvin D. Shapiro, Kansas City (Stinson, Mag, Thomson, McEvers & Fizzell, Walter

K. Disney, Kansas City, of counsel), for appellant.

Charles C. Shafer, Jr., Kansas City, for respondent.

Before DIXON, P. J., PRITCHARD, C. J., and WASSERSTROM, J.

PRITCHARD, Chief Judge.

According to respondent Alexander's motion to amend his pleadings to conform to the evidence, made at the close thereof, this is an action for damages for alleged fraudulent misrepresentation made in connection with a settlement agreement of all disputes between the parties. The judgment, entered upon a jury's verdict, was for $17,000.00 in favor of Alexander. There was also a judgment entered against appellant, Johnson Furnace Company (Johnson), on two counts of its counterclaim which are not here in issue. The dispositive issue is whether Alexander proved a case of fraud.

Alexander had been associated with Johnson in various capacities prior to 1960 in which year he became its president. He resigned that position on July 6, 1965. Thereafter, there were attempts to resolve disputes between the parties which culminated in the execution of a "Settlement Agreement and Release" on January 15, 1968. It is not precisely clear in the transcript, which contains a great deal of irrelevant testimony concerning extramarital affairs and marital discord, just what was the nature of the disputes prior to the agreement. It seems, though, that Alexander's position was that Johnson owed him commissions after his resignation, and that he did not owe personally certain expenditures which he had caused Johnson to make while he was its president—that these expenditures were made for company purposes. It seems that Johnson's position was that Alexander had improperly charged it for his personal expenses. At any rate, the settlement agreement, January 15, 1968, first recited that "Alexander is indebted to the company, and the aggregated amount of his indebtedness has been in dispute, and whereas Alexander has made claims against the Company, which the Company has disputed, and whereas the parties hereto have agreed to settle their disputes in the manner hereinafter provided, * * *." Alexander assigned to Johnson a $3,333.33 note of Apartment Builders, Inc., and "2. The Company does hereby release and forever discharge Alexander from all claims of every kind whatsoever which the Company has against Alexander on this date, whether for money owed to the Company by Alexander or otherwise.", and "3. Alexander does hereby release and forever discharge the company from all claims of every kind whatsoever which Alexander has against the Company on this date, whether for money owed to Alexander by the Company or otherwise."

Paragraph 3 of the amended petition pleads, " * * * that defendant made representations to the Plaintiff that all of its claim of every kind whatsoever were being released by the agreement of January 15, 1968, full well knowing the income tax examination of Defendant's returns would cause claims to be made against the Plaintiff; that Defendant intended Plaintiff to rely upon such representations; that such representations were false and Defendant knew them to be false; that such representations were material to the execution of the release by the Plaintiff; that Plaintiff relied upon such representations in executing the release agreement and was damaged as a direct result, the foregoing amendments in this paragraph being in addition to the allegations initially set forth in paragraphs 9 and 10 of the petition, * *." Paragraph 9 of the initial petition pleaded that the business expenses involved had been deducted in the corporate returns filed by Johnson which "purposefully and willfully breached its release agreement with said Plaintiff by encouraging the Internal Revenue Service to include such business expense items in Plaintiff's personal income tax calculations." Paragraph 10 of the initial petition pleads that the purpose and intent of the release was to settle all controversy and claims, but Johnson "did willfully adopt a course of conduct purposefully designed and calculated to financially in-

jure the Plaintiff and which resulted in his payment of approximately $12,000.00 in interest, tax and penalties (amended to $9,000.00), as heretofore set out and further resulted in requiring Plaintiff to employ legal counsel in order to defend himself from further charges by the Internal Revenue Service and for the prosecution of this action. * * *."

On June 25, 1968, IRS wrote Alexander and provided him with a list of items which Johnson had paid on behalf of Alexander and his wife. The list included various car, travel and country club expenses, as well as checks for cash and life insurance policies. The IRS letter indicated that the expenses had been disallowed by it as expense deductions of the company (Johnson) and would therefore be chargeable as income to Alexander. Alexander testified that at the time he signed the settlement agreement he had no knowledge of an audit of Johnson by IRS, and no knowledge of any disallowance of any expense deductions of the corporation. He first learned of the disallowances on June 25, 1968. He had a conference with IRS after which it included the disallowed corporate expenses in his income, and taxes were assessed on the amount. Upon the advice of an attorney and because he could not afford to, Alexander did not file a claim for tax refund in federal court. To pay the tax deficiency he mortgaged the home, which was given by agreement to his wife in a 1971 divorce proceeding. She thereafter made payments on the mortgage. She testified that she was the one who obtained the loan to pay the tax deficiency, which she delivered, after IRS informed her that the home would be sold to pay the deficiency.

More specifically, Alexander's testimony was: "Q At the time you executed that agreement did you know the income tax returns were being audited? A No, sir. Q Did you know that any amounts had been disallowed by the Internal Revenue Service for the years 1961, 1962, 1963, 1964, 1965, involving expenditures by you on behalf of the company? A No, sir. I wouldn't have signed it if I had known it." And, "Q How do you figure you were damaged by the company's alleged breach of your settlement agreement? A Well, in the first place, all they had to do was pick up the phone when this audit started back in September of 1965 and call me, this was the gentlemanly thing to do, but what they were trying to do was be vindictive and to nail me to the cross." Other than the allusion by Alexander to the September, 1965 date, there is no testimony as to the time of the IRS audit. That there was, in fact, an audit at some time is established by the testimony of Guy W. Johnson: "Q Did you invite Mr. Alexander to sit in on any of these conferences with the Internal Revenue agents with regard to the disallowance of these company expenses? A I would probably have to say no."

The settlement agreement speaks only of the release of claims which Johnson had against Alexander. It does not purport to save Alexander harmless from, or even mention, claims which might have been asserted against him by third parties, such as IRS, which arose out of corporate transactions when he was associated with Johnson prior to July 6, 1965. Ordinarily, disallowances of deductions by a corporation after audit by IRS will result in more tax liability to the corporation. If that had happened, the settlement agreement would have barred any claim against Alexander resulting from more tax paid by Johnson on the theory that corporate expenses were incurred for the personal benefit of Alexander. The gist of Alexander's claim against Johnson is that it fraudulently concealed from him the existence of an IRS claim for additional taxes against Alexander, which had been shifted from the corporation to him personally, "well knowing the income tax examination of defendant's returns would cause claims to be made against the plaintiff." (The evidence does not show that there was a tax liability shifting.)

What the allegations amount to, then, is a fraudulent concealment brought about by Johnson's silence as to the tax claim. The question is whether there was a duty resting upon Johnson to speak and inform Al-

exander of the audit and any resultant action by IRS in shifting the tax liability to Alexander. Had he known this, Alexander says, he would not have signed the settlement agreement, and thus the concealment of the facts was material to his executing the agreement. It is a fair conclusion, under the allegations and proof thus far presented, that Alexander's damage was the deprivation of his ability to negotiate the tax liability in the terms of the settlement agreement because he was not aware of the facts.

■ It has long been the settled law of this state that in certain circumstances fraud may be committed by concealment of facts. In *Denny v. Guyton*, 327 Mo. 1030, 40 S.W.2d 562 (1931), a case of fraudulent concealment was made by one Wolcott, where true facts of profits in a horse and mule buying adventure were withheld from him resulting in his selling his joint adventure interest for much less than it was worth. The court said, loc. cit. 40 S.W.2d 590, "Deceit may be negative as well as affirmative. It may consist in the repression of that which it is one's duty to declare as well as by the declaration of that which is false." In *Jones v. Arnold*, 359 Mo. 161, 221 S.W.2d 187, 193 (1949), it was said, "While silence or concealment becomes fraudulent only where there is a duty to speak and disclose, a legal duty to disclose may exist where there is no existing fiduciary relationship between the parties and where no special confidence is expressly reposed. The duty to disclose may arise from the circumstances of the case, including inequality of condition *and the superior knowledge of one party, which knowledge is not within the fair and reasonable reach of the other party.* (Italics added.) (Citing numerous cases and authorities.) Whether or not a duty to disclose exists and whether or not the circumstances amount to fraud must be determined on the facts of the particular case." See also *Miller v. Higgins*, 452 S.W.2d 121, 124[3–5] (Mo.1970), where actual rental overcharges were not divulged, and a purchaser was required by F.H.A. to refinance or rebate overcharges, a case of fraudulent concealment being made;

*Parker v. Green*, 340 S.W.2d 435 (Mo.App. 1960); and *Hanson v. Acceptance Finance Co.*, 270 S.W.2d 143 (Mo.App.1954).

■ In this case, from the evidence presented, Johnson had knowledge that an IRS audit of its corporate records had been conducted. There is no evidence, however, that at the crucial time of the settlement agreement, January 15, 1968, Johnson, through its officers and directors, had knowledge that IRS had disallowed or would disallow corporate deductions on its returns; or that Johnson knew that any such audit would or might result in additional taxable income to Alexander personally. If that knowledge exists, Johnson, through its officers and directors, being in charge of its operations after July 6, 1965 (and Alexander not being with the company) would have been in a superior position of knowledge to Alexander. There is also no evidence that Johnson in any way encouraged IRS to include the corporate business expenses in Alexander's personal income tax calculations, as pleaded in paragraph 9 of the initial petition. Knowledge of the existence of the fact or facts allegedly wrongfully not divulged is an essential ingredient of the claim to relief for fraudulent concealment. *Dudley v. Dumont*, 526 S.W.2d 839, 847 (Mo.App.1975), "It is well established in our law that there must be scienter, either actual or constructive, to support an action at law for fraud and deceit. Scienter implies guilty knowledge by the tort feasor or a guilty lack of knowledge; the former is charged here. *MacKinnon v. Weber*, 109 S.W.2d 692, 694[3] (Mo. App.1937). The misrepresentation must be made with intent to deceive, 'or with what is recognized as the legal equivalent to a deliberately fraudulent intent to deceive.' *Cohen v. Metropolitan Life Ins. Co.*, 444 S.W.2d 498, 505[5] (Mo.App.1969)." See also *Wilson v. N. W. Electric Power Cooperative, Inc.*, 301 S.W.2d 882 (Mo.App.1957). Because of lack of evidence of Johnson's knowledge, its "scienter" of the existence of facts resulting from the IRS audit, Alexander has failed to make a submissible case of fraudulent concealment. It does not ap-

pear, however, that the evidence would not be available on new trial, and the case should be remanded to give plaintiff the opportunity to develop same. *Swope v. Printz*, 468 S.W.2d 34 (Mo.1971); *Household Finance Company, Inc. v. Watson*, 522 S.W.2d 111 (Mo.App.1975); *Searcy v. Neal*, 509 S.W.2d 755 (Mo.App.1974).

The judgment is reversed and the case is remanded for new trial.

All concur.