Dr. Frank B. McMAHON, Appellant,

v.

MEREDITH CORPORATION, and Dr. Charles G. Morris, Appellees.

No. 78–1091.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1978.

Decided April 2, 1979.

Richard E. Haferkamp of Rogers, Eilers & Howell, St. Louis, Mo., argued, for appellant; John M. Howell, St. Louis, Mo., filed briefs.

George B. Newitt (on brief) of Allegretti, Newitt, Witcoff & McAndrews, Chicago, Ill., argued, for appellee, Meredith Corp.; George P. McAndrews, Chicago, Ill., on brief.

Robert S. Allen (on brief) of Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., argued, for appellee, Dr. Charles G. Morris.

Before HEANEY and STEPHENSON, Circuit Judges, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

This is an appeal from summary judgment entered in favor of appellee Meredith Corporation (Meredith), and from partial summary judgment in favor of appellee Dr. Charles G. Morris, in a copyright infringement, unfair competition, and disparagement action. Morris and appellant, Dr. Frank B. McMahon, are writers in the field of psychology and the gravamen of McMahon's complaint is that Morris plagiarized McMahon's work and Meredith, whose division Appleton-Century-Crofts (ACC)[1] published the works of both authors, implicated itself by publishing the plagiarized material. Prentice-Hall, Inc., a third defendant, was joined in McMahon's complaint and remains a party to the action in the district court, as does Morris with respect to those claims against him on which summary judgment was not entered. Subsequent to entry of its order sustaining the summary judgment motions, the district court,[2] find-

---

* The Honorable William C. Hanson, Senior United States District Judge for the Southern District of Iowa, sitting by designation.

1. In this opinion "Meredith/ACC" refers to ACC while it was operated as a division of Meredith.

2. The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri.

ing no just reason for delay, ordered entry of final judgment on the pertinent claims against Meredith and Morris pursuant to Rule 54(b), F.R.Civ.P. Appellant McMahon thereafter brought this timely appeal.

Meredith and Morris interposed an affirmative defense of a release from liability executed by McMahon and it was upon the basis of such release that the district court granted summary judgment. McMahon unsuccessfully sought to void the release on a theory of fraud in the inducement. Therefore, the sole question before this Court on appeal concerns the validity of the release.

The district court sustained the summary judgment motions to the extent of giving the release retroactive application. *McMahon v. Prentice-Hall*, 443 F.Supp. 596, 598–99 (E.D.Mo.1977). In an effort to gain judgment on all the claims against him, Morris argued that the release should be applied prospectively to future wrongdoing as well. The district court declined to resolve that issue by summary judgment and hence it is not before us.

Dr. McMahon is a citizen of Missouri and the release was executed by him in that state. The district court applied Missouri law to the summary judgment motions, and the parties have relied on Missouri law as governing disposition of the appeal. Hence, we look to the substantive law of Missouri.

The alleged fraud involves failure on the part of Meredith[3] to disclose a material fact to McMahon, which failure allegedly resulted in consummation of the release by McMahon. The fact in issue was Meredith's ongoing contacts with Prentice-Hall

through an agent in an effort to interest Prentice-Hall in purchasing Meredith's Appleton-Century-Crofts division. Prentice-Hall eventually purchased ACC approximately two months after the release was signed. Dr. McMahon has described these contacts as "negotiations." For the purpose of the summary judgment motions the district court assumed the existence of "negotiations" between Meredith and Prentice-Hall for the sale of ACC, 443 F.Supp. at 598, and appeared to assume also that any negotiations were material to the release.[4] Since under McMahon's allegations of fraud the concealment was passive rather than the product of a positive misrepresentation of fact, the district court correctly narrowed the issue to "whether defendant Meredith had a duty to speak" under Missouri law. 443 F.Supp. at 598. The district court held there was no such duty on the uncontroverted facts. We agree and affirm.

## I.

In 1968 Dr. McMahon contracted with Prentice-Hall to write an introductory psychology textbook, published in 1972 under the title, *Psychology, the Hybrid Science*. In late 1971 Dr. McMahon entered into three contracts with Meredith/ACC. These provided that Dr. McMahon would write and Meredith/ACC would publish a book on abnormal psychology and other related materials. The abnormal psychology book was never published by Meredith/ACC because of a breakdown in the author-publisher relationship precipitated by Meredith/ACC's

---

**3.** Meredith acted for itself and Dr. Morris in the negotiation of the release. It is not completely clear from the record whether Meredith's actions in this regard were gratuitous, or whether it performed as an agent. In any event, the two are associated so that if the release is void vis-a-vis Meredith, it is also with respect to Dr. Morris. Hence the focus is on the relationship between Meredith and Dr. McMahon.

**4.** It is apparent that there is a substantial factual issue as to the extent of the contacts between Meredith and Prentice-Hall at the time the release was signed. There is extensive indication in the summary judgment record that the sale of ACC to Prentice-Hall was in its

nascent stages when McMahon signed the release; that Prentice-Hall had merely been contacted by Meredith's agent, was attempting to gain further information about ACC's assets, and had formed no definite interest in the acquisition of ACC. Moreover, the fact that Prentice-Hall gained ACC only after competitive bidding against three other publishers indicates that when the release was signed two months previous to the bidding the sale to Prentice-Hall was at best speculative. The district court's assumption of the existence of "negotiations" of course favored Dr. McMahon. *See Bishop v. Wood*, 426 U.S. 341, 347 n.11, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

publication in early 1973 of Dr. Morris' book entitled *Psychology, An Introduction*. Dr. McMahon has claimed that Morris' book plagiarized substantial portions of McMahon's earlier *Psychology, the Hybrid Science*. Dr. McMahon also felt that Meredith/ACC had wrongfully used his name in the acknowledgments portion of the Morris book, and McMahon was further dissatisfied because he believed Merdith/ACC had attempted to exert improper control over the contents of the abnormal psychology text.

By mid-1973 Dr. McMahon considered himself to be in an intolerable situation with Meredith/ACC. McMahon retained an attorney, Mr. Jack Chasnoff, and after a series of conferences matters gelled to the point that a four-party transaction founded on mutual releases became a possibility. Meredith/ACC would release Dr. McMahon from his contracts in return for releases from McMahon and Prentice-Hall (as publisher of the plagiarized work) of claims against Meredith/ACC and Dr. Morris arising out of the publication of *Psychology, An Introduction*.[5] All parties contemplated that Dr. McMahon would subsequently contract with Prentice-Hall for the publication of the abnormal psychology work.

Finalization of the transaction was delayed by Meredith/ACC's insistence on reimbursement of some $24,000 in pre-publication expenses it claimed to have incurred in anticipation of Dr. McMahon's book. However, on August 9, 1973 Mr. Howard Abrahams, counsel for Meredith/ACC, accepted a counteroffer previously made by Mr. Chasnoff of $2,200 plus the McMahon and Prentice-Hall releases in exchange for Meredith/ACC's release of McMahon's contract. During the telephone conversation between Mr. Abrahams and Mr. Chasnoff in which this agreement was reached, Abrahams revealed that time was of the essence and made other statements which indicated to Chasnoff that ACC was to be sold and accordingly Meredith was interested in

speedily resolving disputes that might interfere with the sale. Mr. Chasnoff communicated these thoughts in an August 10, 1973 letter to Mr. William Daly, secretary and general counsel for Prentice-Hall. No inquiry was ever made by Dr. McMahon or Mr. Chasnoff, either to Meredith or Prentice-Hall, as to whether Prentice-Hall might be a prospective purchaser. Nor was any indication given to Meredith that the identity of potential purchasers was a matter of importance to Dr. McMahon in concluding the release.

In late August the parties exchanged releases as arranged. The release at issue here was signed by Dr. McMahon on August 22, 1973, and stated:

> The undersigned, Frank B. McMahon, Jr. in consideration of the termination of three contracts dated November 15, 1971 between Appleton-Century-Crofts, Educational Division, Meredith Corporation and the undersigned, and in consideration of a contemporaneous release from Appleton-Century-Crofts, Educational Division, Meredith Corporation and the return to him of his manuscript and all of his rights as author in and to those works in the field of abnormal psychology which were the subjects of the contracts referred to above, hereby releases Appleton-Century-Crofts, Education Division, Meredith Corporation from any and all liability to him arising out of or which might arise out of any of said contracts or out of the dealings of the parties thereto from the beginning of time up to the date hereof, and the undersigned also releases Charles G. Morris, as author, and Appleton-Century-Crofts, Educational Division, Meredith Corporation, as publisher, of a book entitled "PSYCHOLOGY AN INTRODUCTION" from any liability to him arising out of the writing or publication of said book, and specifically (but without limiting the generality of the foregoing) releases any claims which the undersigned has or might have arising out of the use of his name in the "ac-

5. Dr. McMahon ultimately executed a broad release releasing Meredith/ACC "from any and all liability to him arising out of or which might arise out of any of [the] contracts or out of the dealings of the parties. . . ." *See* release quoted *infra*.

knowledgements" section of said book or for copyright infringement by reason of the said writing or publication of said book. The undersigned also releases Appleton-Century-Crofts, Educational Division, Meredith Corporation from any liability to him arising out of its alleged publication in the past of erroneous and damaging comments concerning him or his book entitled "PSYCHOLOGY: THE HYBRID SCIENCE."

In December 1973 Dr. McMahon contracted with Prentice-Hall for the publication of the abnormal psychology book.

At the same time agreement was reached concerning Dr. McMahon's situation, Meredith was attempting to sell its ACC division. On July 30, 1973 Meredith issued a press release disclosing that it would attempt to sell ACC, including the college textbook department. Previously an investment banking firm—White, Weld & Company—had been retained by Meredith as exclusive sales agent for the ACC assets. White-Weld proceeded to contact some ten to twelve major publishing houses. On August 8, 1973 Mr. Keith Gollust of White-Weld called Prentice-Hall's chairman of the board, Mr. Howard Warrington, to solicit Prentice-Hall's interest in ACC. A memorandum of the call by Mr. Warrington indicates that Warrington asked Mr. Gollust to send more information about ACC's literary properties. In the same memorandum Mr. Warrington directed subordinates to attempt to obtain more information about ACC in an effort to determine "whether or not it is worth bidding on." Mr. Warrington was away from the office until September 3, 1973 and during his absence employees of Prentice-Hall were seeking information about the ACC assets to be sold. This was the status of contacts between Meredith and Prentice-Hall at the time Dr. McMahon released Meredith/ACC and Dr. Morris from liability. No decision had been made by Prentice-Hall to purchase ACC,

and indeed, it is clear that any negotiations were tentative.

Mr. Abrahams, Meredith's attorney, knew that the ACC division was for sale when he negotiated the mutual releases with Mr. Chasnoff. He did not know what publishers were being contacted by White-Weld, and he did not know that Prentice-Hall was among them.

General negotiations between White-Weld and various publishing companies continued until the end of September 1973, when the four most likely purchasers were told to submit their bids by October 15, 1973. Prentice-Hall was one of these and with the three others submitted a bid on October 15. Prentice-Hall's bid was accepted, and on October 30, 1973 the sale of ACC's medical, nursing, reference, and college textbook titles was completed.[6]

Dr. McMahon knew of the ACC sale to Prentice-Hall by late 1973 or early 1974, and McMahon's attorney, Mr. Chasnoff, correctly concluded that a sale was forthcoming as a result of his August 9, 1973 conversation with Mr. Abrahams.

Dr. McMahon maintains that he did not make any connection between his execution of the release and the sale of ACC until late 1976 or early 1977 after his relations with Prentice-Hall deteriorated. Prentice-Hall published a second and third edition of McMahon's *Psychology, The Hybrid Science*, the latter in April 1977. Prentice-Hall also published the abnormal psychology textbook in January 1976. However, Prentice-Hall like Meredith/ACC before it, published both Dr. McMahon's works and Dr. Morris' alleged plagiarized material. Prentice-Hall continued to publish the Morris book acquired from ACC, *Psychology, An Introduction*, including a second edition published in January 1976. Thus Dr. McMahon found himself to be in substantially the same type of position with Prentice-Hall he found objectionable with re-

---

6. Meredith's desire was to sell the various departments of ACC as a package, and with the exception of two departments this was accomplished in the sale to Prentice-Hall. The record reflects that the package deal idea was initially unsatisfactory to Prentice-Hall because some unprofitable material was included, and for a period of time in September 1973 Prentice-Hall's interest in the purchase appears to have waned.

spect to Meredith, and as a result of alleged subsequent wrongdoing on the part of Prentice-Hall, he gained little from his release of Meredith and Dr. Morris from liability.

The district court, implicitly finding no genuine issues of material fact, concluded Meredith had no duty to speak and hence committed no fraud under these circumstances. 443 F.Supp. at 598. For reasons explained more fully below, the question of Meredith's duty to speak and advise Dr. McMahon of negotiations between Meredith and Prentice-Hall for the sale of ACC turns on whether the existence of negotiations was beyond "the fair and reasonable reach" of McMahon. *Id.* In the absence of any inquiry on the part of Dr. McMahon, the district court concluded that knowledge of the existence of negotiations was within McMahon's fair and reasonable reach.

## II.

This Court has repeatedly recited the limited circumstances in which disposition by summary judgment is appropriate. *See, e. g., Narez v. Wilson,* 591 F.2d 459 at 462–463 (1979); *McCamley v. Moss,* 587 F.2d 391, 394 (8th Cir. 1978); *EEOC v. Liberty Loan Corp.,* 584 F.2d 853, 857 (8th Cir. 1978); *Goodman v. Parwatikar,* 570 F.2d 801, 803 (8th Cir. 1978).

> [S]ummary judgment is an extreme remedy and one which is not to be entered unless the movant has established its right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances.
>
> In passing upon a motion for summary judgment the court is required to view the facts in the light most favorable to the party opposing the motion and to give that party the benefit of all reasonable inferences to be drawn from the underlying facts disclosed in the pleadings, depositions and affidavits filed in the case. (Citations omitted.)

*EEOC v. Liberty Loan Corp.,* 584 F.2d at 857. In certain cases, however, and this is

one of them, summary judgment is the appropriate procedural vehicle to bring into issue the legal effect of a contractual bar to liability. *See Wagoner v. Mountain Savings and Loan Association,* 311 F.2d 403, 406 (8th Cir. 1962); *see also Parish v. Howard,* 459 F.2d 616, 618 (8th Cir. 1972). Viewing the facts and inferences most favorably in favor of Dr. McMahon we perceive no genuine issue of material fact relevant to Meredith's duty to speak and conclude that Meredith and Morris have established their right to judgment with the requisite clarity.

A release is void or voidable in Missouri if induced by fraud. *See Abbey v. Heins,* 546 S.W.2d 553, 554 (Mo.App.1977); *Kestner v. Jakobe,* 412 S.W.2d 205, 208–09 (Mo.App.1967); *see also Dewey v. Jenkins,* 567 S.W.2d 382, 389 (Mo.App.1978). Where, as here, there is no dispute as to the execution of the release, the person attacking the release assumes the burden of proving the fraud. *Abbey v. Heins,* 546 S.W.2d at 554.

In Missouri the elements of an action or defense in fraud are well-established:

> (1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6). The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon. . . .

*Wood v. Robertson,* 245 S.W.2d 80, 82 (Mo. 1952). *See St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 562 F.2d 1040, 1054 (8th Cir. 1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978); *Heckenkamp v. Kennedy,* 267 F.2d 887, 891 (8th Cir. 1959); *Abbey v. Heins,* 546 S.W.2d at 554, 557; *Ackmann v. Keeney-Toelle Real Estate Co.,* 401 S.W.2d 483, 488 (Mo.1966). A failure to disclose a material fact can be considered to be an implicit representation of the nonexistence of such fact on which a party may rely, but only if the alleged fraud-feasor has a duty to speak. *See Daffin v. Daffin,*

567 S.W.2d 672, 677 (Mo.App.1978); *National Alfalfa Dehydrating and Milling Co. v. 4010 Washington, Inc.,* 434 S.W.2d 757, 765 (Mo.App.1968); *see also Hill v. Securities Investment Co.,* 423 S.W.2d 836, 841–42 (Mo.1968). Whether there exists a duty to speak in turn is a function of the defrauded party's ignorance of the truth, means of acquiring it, and relation to the other party, thus implicating the same considerations which underlie elements six, seven, and eight of the general elements of fraud. Missouri courts have consistently held that a duty to speak may arise under any of three conditions: (1) where there is a fiduciary relationship between the parties or a relationship of confidence; (2) where there is an inequality of condition between the parties; and (3) where one party has superior knowledge not within the fair and reasonable reach of the other party. *See, e. g., Citizens Bank of Windsor v. Landers,* 570 S.W.2d 756, 762 (Mo.App.1978); *Alexander v. Johnson Furnace Co.,* 543 S.W.2d 539, 542 (Mo.App.1976); W. Prosser, Law of Torts § 106, at 695–98 (4th ed. 1971).

Dr. McMahon and Meredith did not have a confidential or fiduciary relationship in connection with the transaction involving the exchange of mutual releases, *see Kestner v. Jakobe,* 446 S.W.2d 188, 195 (Mo.App. 1969); *see also White v. Mulvania,* 575 S.W.2d 184, 189 (Mo.1978), and the arms-length nature of the transaction, involving as it did negotiations among counsel for the parties, does not display any relevant inequality of condition. *See generally Taylor v. Western Casualty & Surety Co.,* 523 S.W.2d 582, 586 (Mo.App.1975). Consequently, the question of a duty to speak focuses attention on the last element above: whether Meredith had superior knowledge of the existence of negotiations with Prentice-Hall for the sale of ACC not within the fair and reasonable reach of Dr. McMahon. We assume for this purpose that Meredith had the superior knowledge as a party to the negotiations, hence if Meredith did have a duty to speak it would be because knowledge was not within the fair and reasonable reach of Dr. McMahon.

Particularly in the area of nondisclosure the law of fraud is hardly a seamless web, and we have found Missouri to be no exception. *See* W. Prosser, Law of Torts § 106, at 695–99 (4th ed. 1971). We have carefully reviewed applicable Missouri case law and are convinced that in the context of this case the existence of a genuine issue as to whether knowledge of the negotiations was within Dr. McMahons' reach is closely associated with what actions, if any, he took to acquire information material to the transaction. In a somewhat varied pattern of case law, Missouri courts have suggested that absent a relationship of trust or confidence, or inequality of condition, and where the alleged fraud does not involve positive misrepresentations or fraudulent designs to cause a party to forego inquiry (none of which is present here), it is incumbent on the person claiming to be defrauded to exercise reasonable care by employing available means of knowledge. *See Tietjens v. General Motors Corp.,* 418 S.W.2d 75, 81–83 (Mo.1967); *Demmas v. St. Louis Outdoor Advertising, Inc.,* 452 S.W.2d 303, 306 (Mo.App.1970); *Kestner v. Jakobe,* 446 S.W.2d at 195; *Universal C.I.T. Credit Corp. v. Tatro,* 416 S.W.2d 696, 703 (Mo. App.1967); *Hanson v. Acceptance Finance Co.,* 270 S.W.2d 143, 145–50 (Mo.App.1954). Where this duty is applicable, one party generally may not claim fraud on the basis of the other's silence unless he has exercised due diligence in his own interest. *See, e. g., Dewey v. Jenkins,* 567 S.W.2d at 386; *Universal C.I.T. Credit Corp. v. Tatro,* 416 S.W.2d at 703–04. Implicit in the duty to use reasonable care to acquire knowledge of facts is the concept of notice. *See Tietjens v. General Motors Corp.,* 418 S.W.2d at 82; *cf. Hanson v. Acceptance Finance Co.,* 270 S.W.2d at 150 (appearing to apply the doctrine in the context of a positive misrepresentation). "Notice is any fact which would put an ordinarily prudent person on inquiry," *State v. Rickhoff,* 541 S.W.2d 47, 50 (Mo.App.1976), and inquiry notice, where present, is treated as actual knowledge of the facts subject to inquiry. *See Hatcher v. Hall,* 292 S.W.2d 619, 625 (Mo.App.1956). In view of the settled rule with respect to claims of fraud by nondisclosure that there

is no duty to speak "where the other party has knowledge of the true facts," *National Alfalfa Dehydrating and Milling Co. v. 4010 Washington, Inc.,* 434 S.W.2d at 765, Meredith would have no duty to reveal facts to Dr. McMahon the latter was on inquiry notice of.

The relationship between Meredith and Dr. McMahon had soured to the point where in substance they were adversary parties. Both sides were represented by attorneys. Both had something the other wanted. There is no question of any positive misrepresentation; Meredith has been indicted only for its silence. In short, the foregoing principles are clearly applicable.

 Two related material facts are at issue: first, ACC was for sale, and second, Prentice-Hall was negotiating as a potential buyer. Dr. McMahon, through his attorney, knew from remarks made by Meredith's attorney that ACC was for sale and, in fact, the sale was the subject of a press release and hence readily discoverable. Knowing that a sale was in the offing, and in view of Prentice-Hall's obvious position in the marketplace as a competitor of Meredith, we believe that the exercise of reasonable care on McMahon's part at the very least required him to make inquiry to determine whether Prentice-Hall might be a prospective purchaser and what its level of interest, if any, was; particularly so if the potential sale of ACC to Prentice-Hall was as material to the transaction as Dr. McMahon now claims it to have been. Accordingly, Dr. McMahon was on constructive or inquiry notice that as a potential buyer Prentice-Hall might be in contact with Meredith. Yet Dr. McMahon made no effort to find out Prentice-Hall's level of interest in the purchase of ACC, though he could have asked Meredith for information,[7] or more appropriately, he could have queried Prentice-Hall with which McMahon was then dealing on cordial terms, and which would have had the better information as to the likelihood of a sale to Prentice-Hall. No genuine issue is raised that inquiry would have been futile, nor is there any indication in the record that if requested Meredith or Prentice-Hall employees could not or would not have sought and provided accurate information. Had reasonable inquiry been made and rebuffed, McMahon would be in a position to show at trial that the information was not within his fair and reasonable reach. *See Wilburn v. Pepsi-Cola Bottling Co. of St. Paul,* 410 F.Supp. 348, 353 (E.D. Mo.1976). Instead Dr. McMahon is in the untenable position of asserting he could not attain information the potential existence of which he should have inferred from matters within his knowledge at the time he signed the release. In the absence of effort to discover the true facts, Dr. McMahon is charged with knowledge of the fact that Prentice-Hall was negotiating with Meredith for the possible purchase of ACC. The existence of constructive notice and the failure to exercise due diligence pretermit the question of fair and reasonable reach, for there is no duty to speak where both parties have actual or constructive knowledge of the fact in issue. *See National Alfalfa Dehydrating and Milling Co. v. 4010 Washington, Inc.,* 434 S.W.2d at 765; *Hatcher v. Hall,* 292 S.W.2d at 625. As a consequence, there is no ground on which Dr. McMahon could bear his trial burden of proving the existence of negotiations was beyond his fair and reasonable reach.

In an effort to counter the duty of inquiry, Dr. McMahon contends that Mr. Chasnoff was not alerted because "if ACC was being sold to Prentice-Hall, which would likely include the right to the Morris book, then Meredith would not need a release [from Prentice-Hall]." Appellant's Brief at 30. We are unpersuaded that the fact Meredith wanted concurrent releases from McMahon and Prentice-Hall raises a genuine issue as to Dr. McMahon's duty to make inquiry. Any purchase of ACC by Prentice-Hall bears no real relation to the motivation of Meredith to seek releases since a sale would not extinguish the legal claims of either Dr. McMahon or Prentice-Hall. Moreover, in view of the materiality Dr. McMahon has ascribed to it, the possi-

---

**7.** By affidavit Mr. Abrahams, the Meredith attorney with whom Dr. McMahon negotiated, stated that he did not know what publishers were being solicited to buy ACC, though he did know White-Weld had been retained and that they were querying various publishers.

bility that Prentice-Hall might be a potential purchaser and hence the need for inquiry is too plain and apparent on the undisputed facts surrounding negotiations of the release to be reasonably affected by surmise from the mere fact Meredith sought a concurrent release from Prentice-Hall and Dr. McMahon.[8] *See Chenette v. Trustees of Iowa College, Grinnell, Iowa,* 431 F.2d 49, 53 (8th Cir. 1970); *cf. First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 56 (1968) (in which the evidence non-moving party relied on lacked sufficient probative force.)

Because Dr. McMahon was on notice that ACC was being sold and that Prentice-Hall was a potential purchaser and thus likely to be in contact with Meredith at the time he released Meredith/ACC and Morris from liability, Dr. McMahon had a duty to make inquiry to safeguard against the likelihood that Prentice-Hall might in fact be the purchaser. Having failed to make any inquiry, Dr. McMahon is charged with constructive

notice of the fact in issue. Meredith, therefore, had no duty to speak in the absence of effort on McMahon's part to establish the true facts.[9]

Affirmed.

---

8. Dr. McMahon also maintains that "Meredith's insistence on a release from Prentice-Hall led Dr. McMahon away from any thought of fraudulent conduct. . . ." In this regard, Dr. McMahon relies on *Feeney v. Cook,* 242 S.W.2d 524, 529 (Mo.1951) in which the Supreme Court of Missouri observed that if a party's silence is accompanied by "any word or act . . . which tends to the suppression of the truth . . . or . . . to a withdrawal or distraction of the other party's attention . . . from the real facts" concealment becomes fraudulent. Dr. McMahon can get no comfort from analogy to *Feeney* in view of the fact that Mr. Chasnoff correctly inferred the truth from Meredith's request for a release; that a release was desired in order that McMahon's legal claims would not interfere with ACC's sale.

9. An additional ground asserted in favor of the motions for summary judgment in the district court was that the federal and state statutes of limitation on the claims against Meredith and Morris had run. There was no dispute that the usual limitations period had run before McMahon filed his complaint on claims accruing prior to June 3, 1974. Dr. McMahon responded to the motions by arguing that the alleged fraud in the inducement of the release tolled the running of the limitations period, and that he did not uncover the fraud "until about the end of 1976 or first part of 1977 when plaintiff believes he first became convinced that Prentice-

Hall and Meredith were negotiating for the sale and purchase of Appleton during the settlement of his disputes with Meredith." Record at 99. The district court did not address the limitations issue in granting summary judgment hence it is not before us. We think it appropriate to observe, however, that assuming the limitations period was tolled by the fraudulent concealment doctrine, *see, e. g., Willmar Poultry Co. v. Morton-Norwich Products, Inc.,* 520 F.2d 289, 294–95 (8th Cir. 1975), *cert. denied,* 424 U.S. 914, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976); *Vanderbloom v. Sexton,* 422 F.2d 1233, 1240 (8th Cir.) *cert. denied,* 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970), it would appear that Dr. McMahon had all the crucial facts at hand from which to discover the alleged fraud in late 1973 or early 1974 when Prentice-Hall's acquisition of ACC became known to him. *See Willmar Poultry Co. v. Morton-Norwich Products, Inc.,* 520 F.2d at 295–96. Beyond arguing that some copies of the Morris book published by Meredith may have been sold by Prentice-Hall after June 3, 1974, Dr. McMahon's only rejoinder in district court in substance was that he did not deduce the fraud from facts previously known to him until the end of 1976 or first part of 1977. Under these circumstances part or all of the claims in issue are very likely time-barred. *See Herm v. Stafford,* 455 F.Supp. 650, 653–54 (W.D.Ky.1978).