**UNITED INDUSTRIAL SYNDICATE, INC., Appellant,**

v.

**WESTERN AUTO SUPPLY COMPANY, Appellee.**

**No. 81–2393.**

United States Court of Appeals, Eighth Circuit.

Submitted June 16, 1982.

Decided Aug. 26, 1982.

Herzog, Kral, Burroughs & Specter, Peter W. Herzog, Jr., Thomas Lay Burroughs, St. Louis, Mo., for United Indus. Syndicate, Inc., appellant.

Robert S. Allen, Michael A. Vitale, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for appellee Western Auto Supply Co.

Before HEANEY and ARNOLD, Circuit Judges, and COLLINSON,* Senior District Judge.

HEANEY, Circuit Judge.

This diversity action arises out of the termination by Western Auto Supply Company (hereafter Western) of its longstanding business relationship with the Eagle Division of United Industrial Syndicate, Inc. (hereafter UIS). UIS alleges that Western's termination was actionable on

---

* The Honorable WILLIAM R. COLLINSON, United States Senior District Judge for the Western District of Missouri, sitting by designation.

contract, fraud and other grounds. The district court granted Western's motion for summary judgment. We reverse the entry of summary judgment on the contract and fraud counts and remand the case for further proceedings, 527 F.Supp. 869.

The Eagle Division of UIS manufactured kitchen ranges under a private label for sale by independent retailers. For more than thirty years, Eagle was the exclusive or principal supplier of ranges sold by Western through its retail stores. Western, in turn, was a major customer of Eagle during these years, most recently accounting for one-third to one-half of Eagle's sales. In the 1960's, Western and Eagle orally agreed that neither party would terminate the relationship except upon six months notice.[1] The oral agreement was reaffirmed in 1974, after Eagle had been acquired by UIS and after a new employee had taken over buying duties for Western. It was again reaffirmed in 1978, when Western became concerned over the death of Eagle's president and the subsequent installation of new management at Eagle. From 1978 to 1980, Eagle continued to supply Western. During this period, dealings between the parties continued much as before, with Western soliciting Eagle to participate, for example, in Western's trade shows and in formulation of Western's 1980 advertising and catalogue plans which featured Eagle ranges. On March 31, 1980, however, Western abruptly terminated its relationship with Eagle, without six-months prior notice. It began selling ranges supplied by a different manufacturer, and closed out its Eagle inventory after taking delivery of ranges for which there were outstanding purchase orders at the time of the cutoff.

UIS commenced the present action in April of 1980, alleging breach of the oral contract which required notice prior to termination (Count I); alternatively seeking recovery in *quantum meruit* (Count II);

alleging fraud on the part of Western (Counts III and IV); and alleging that the manner in which Western disposed of its Eagle inventory caused actionable harm to Eagle's ability to find alternative outlets for its ranges and to otherwise continue as a going concern (Counts V and VI). The Eagle division of UIS went out of business in December of 1980. The present litigation proceeded through discovery and was set for trial in November of 1981, when summary judgment was granted against UIS on all counts.

## A. The Oral Contract.

The existence of the oral agreement not to terminate without six months notice is not in dispute, for purposes of summary judgment. The district court ruled that the agreement was unenforceable as a matter of law under the UCC statute of frauds, which generally requires a writing to enforce a sales agreement involving more than $500 in goods. See Mo.Rev.Stat. § 400.2–201 (1978). Here, the oral agreement on its face is not a contract for the sale of goods, and the court properly recognized that the test is whether "the predominant purpose or character" of the agreement is the sale of goods or something else. See *Bonebrake v. Cox*, 499 F.2d 951 (8th Cir. 1974). In finding that the oral agreement between Eagle and Western was essentially one for the sale of goods, the district court reasoned that it was analogous to a contract for "the sale of goods not yet manufactured," which under pre-UCC law had been deemed a contract for the sale of goods; and that the parties had an ordinary buyer/seller relationship, such that an agreement not to terminate was, virtually *a fortiori*, a sale of goods agreement.

 This analysis, however, overlooks the history and character of the business relationship between Eagle and Western

---

1. The discussion of facts and possible inferences therefrom should not be viewed as establishing any ultimate facts or conclusions. In reviewing a summary judgment, we are "required to view the facts in the light most favorable to the party opposing the motion and to give that party the benefit of all reasonable inferences to

be drawn from the underlying facts disclosed in the pleadings, depositions and affidavits in the case." *EEOC v. Liberty Loan Corp.*, 584 F.2d 853, 857 (8th Cir. 1978). Here, there is sufficient evidence to establish the oral agreement, for purposes of a summary judgment motion.

and unduly emphasizes that the underlying transactions involved the sale of goods, a fact which simply is not dispositive in construing the legal effect of the oral agreement. Missouri courts have consistently recognized that, even where sales of goods are a substantial part of the transaction, the dominant purpose of a particular agreement may be independent of such sales and, hence, be outside the UCC statute of frauds. *See, e.g., Prince v. Spire Corp.,* 584 S.W.2d 108, 111 (Mo.App.1979), *citing with approval Robertson v. Ceola,* 255 Ark. 703, 501 S.W.2d 764 (1973). In *Robertson,* an oral agreement to purchase and install over $15,000 worth of tiles was deemed a service contract and not a sale of goods contract, notwithstanding that the tiles obviously were "goods" under the UCC and, moreover, that the lost profits damages recoverable in that case included a fixed fifteen percent profit on the sale of such goods.[2] *Robertson v. Ceola, supra,* 501 S.W.2d at 766. The Missouri court adopted this approach, quoting from *Robertson* that "[u]nless the principal object of the agreement is for sale of goods," the UCC does not apply. *Prince v. Spire Corp.,* 584 S.W.2d 108, 111 (Mo.App.1979). Moreover, in analyzing whether an oral contract is within the scope of the UCC, Missouri courts have focused case-by-case on "the circumstances surrounding its execution, taking into account the subject matter of the contract and the apparent object to be accomplished." *Stagner v. Staples,* 427 S.W.2d 763, 766 (Mo.App.1968) (citations omitted).

Here, the circumstances and object of the oral agreement must be viewed in light of the nearly forty-year relationship between Eagle and Western. Eagle was Western's exclusive supplier of ranges during many of these years and was at least the principal supplier throughout the period. Similarly, although Eagle sold to other accounts as well, Western was Eagle's primary customer. Eagle maintained an inventory of completed ranges and ranges-in-production to meet Western's needs generally and to meet its periodic requests for expedited "dropshipments." Eagle also made various extended price and quantity commitments to facilitate advertising and other marketing strategies by Western and maintained inventories of spare parts to meet Western's servicing needs.

The character, duration and mutual dependence of this relationship bear little resemblance to a single-shot buy-sell agreement; rather, they more closely resemble a distributorship or agency arrangement. As we have noted, the common law has evolved to recognize that business relationships may fall somewhere between formal distributorships and simple buyer/seller arrangements, and that in such "hybrid" relationships, the law may imply a requirement of reasonable notice before termination. *See, e.g., Wrist-Rocket Manufacturing Co., Inc. v. Sanders,* 379 F.Supp. 902, 917–920 (D.Neb.1974), *aff'd in part, rev'd in part,* 516 F.2d 846, 850 (8th Cir.), *cert. denied,* 423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100 (1975). *See also Lockewill v. United Shoe Corp.,* 547 F.2d 1024, 1028–1029 (8th Cir. 1976), *cert. denied,* 431 U.S. 956, 97 S.Ct. 2678, 53 L.Ed.2d 272 (1977) (applying Missouri law);[3] Corbin on Contracts § 1266 (1964).

Here, the relationship between Eagle and Western was not that of a formal distributorship, but neither was it that of a simple buyer and seller. In this context, the six-month notice agreement transcends the mere sale of goods and reflects a bargained-for exchange of mutual benefits and

---

**2.** Thus, the fact that here Eagle seeks to recover lost profits on reasonably expected sales during what should have been the six-month notice period, does not establish that the notice agreement was one for the sale of goods. The purpose of an agreement is distinguishable from how to measure the damages caused by its breach.

**3.** The issue in *Lockewill* was what implied notice term should be deemed reasonable, where no express notice agreement existed. *Lockewill v. United Shoe Corp., supra,* 547 F.2d at 1028. It thus is not controlling here, where an express six-month notice agreement is alleged. *Lockewill* is nonetheless noteworthy because it supports the proposition that business relationships similar to the instant one present mixed elements of agency and contract law. *Id.*

detriments that are independent of particular sales transactions. Western gained an assured source of supply around which it could develop a marketing strategy and also obtained more prompt shipment from built-up inventories; in turn, it gave up what otherwise would be its right to replace Eagle at will as its primary supplier. Eagle gained an assured outlet for a major share of its production, but became obligated to meet the reasonable supply requests of Western with attendant burdens of larger inventories and the like. In our judgment, these mutual exchanges are the dominant purpose of the agreement not to terminate without six months notice; and, moreover, such a purpose is independent of the specific sales which took place from time to time between the parties. Accordingly, it was error to grant summary judgment on the grounds such agreement was unenforceable under the UCC statute of frauds.

In light of our disposition of this issue, there is no need to reach certain claims raised by the parties,[4] but clarification of others is necessary.

The district court ruled that the oral agreement not to terminate was too vague to lend itself to anything but a speculative measure of damages. It also rejected UIS's claim for recovery in *quantum meruit* (Count II of the complaint), reasoning that UIS had not shown any benefit to Western nor any detriment to UIS which could be attributed to the termination. Both of these rulings are predicated on the mistaken view that the oral agreement solely related to the sale of goods, *i.e.*, that because the notice agreement did not specify price or quantity terms, it was void for vagueness; and because specific goods ordered by

Western prior to the termination were paid for, no unjust benefit or detriment flowed from the termination. As we have noted, the legal benefits and detriments of the oral agreement are independent of the sale of goods. Western obtained a legal benefit from Eagle's commitment to meet any reasonable supply request for up to six months after either party's termination notice. Eagle in turn incurred legal detriment by committing itself to meet such requests. It relied on the agreement to the extent it produced inventories and took other actions in expectation of meeting Western's reasonably foreseeable needs over the next six months.

The issue thus is not vagueness or lack of benefit and detriment, but rather causation and the proper measure of damages. The fundamental measure of contract damages is that which places the non-breaching party in the position it would have been but for the breach. *See, e.g., Hellrung v. Viviano*, 7 S.W.2d 288, 290 (Mo. App.1928); Corbin on Contracts § 1002. Here, UIS seeks to recover lost profits on the transactions it reasonably would have made with Western during the six-month notice period, as well as certain reliance damages (out-of-pocket costs incurred in expectation of the relationship continuing for at least six months).[5] These damage theories properly describe the general types of injury which may flow from breach of the notice agreement. *See, e.g., Coonis v. City of Springfield*, 319 S.W.2d 523, 528 (Mo. 1958); *Vigiano v. Wylain, Inc.*, 633 F.2d 522, 528 (8th Cir. 1980); *Restatement of Contracts*, § 329; Corbin on Contracts, § 1002.

---

4. UIS contends, for example, that part performance of the oral agreement takes it outside the statute of frauds and renders it enforceable. The argument is that UIS's general performance pursuant to the long-standing course of dealings—and in particular, maintaining inventory sufficient to meet Western's anticipated needs—constitutes full or partial performance of the oral agreement so as to take it out of any statute of frauds. This theory is consistent with our view of the essence of the oral agreement, but we need not and do not decide such a question because review here is limited to the

summary judgment motion, which was granted on other grounds.

5. UIS also contends that the abrupt termination caused Eagle to go out of business and seeks to recover the difference between Eagle's value as a going concern and its value in liquidation. We express no view of whether the evidence is sufficient to establish this causal link or whether such harm is within the scope of foreseeability for which compensatory damages may be recovered.

The appropriateness of any precise measure in this case, however, turns on factual disputes which we cannot resolve in reviewing summary judgment. Western, for example, points to record evidence that Eagle was in financial trouble; that UIS was actively seeking to sell or liquidate this division at the time of Western's termination; and that Western experienced increasing quality problems with Eagle stoves and that the volume of such purchases declined in 1978 and early 1979. Such factors might well bear on the measure of UIS's reasonable expectancy of sales and lost profits for the six-month notice period, or affect the extent of reliance which could be deemed reasonable. The foregoing assertions are controverted, however, by increasing sales to Western later in 1979 and by other evidence offered by Eagle. We do not decide any of these factual disputes, but note them only to show that if UIS proves up the oral agreement and its breach by Western, the agreement is not so vague or devoid of legal benefits and detriments as to preclude recovery.

### B. *Fraud Claims.*

UIS also alleges that Western is liable for fraud in connection with the latter's conduct between late 1979 and the termination in late March of 1980—specifically, that such conduct is actionable as either intentional (Count III) or negligent (Count IV) misrepresentation. The essence of this complaint is that Western either knew or should have known that its affirmative conduct and nondisclosures during this period preceding termination would reasonably cause Eagle to rely on the continuation of its role as Western's primary supplier for at least a short-term period (up to six months); that Eagle did so rely to its detriment; and that Western knew such an expectation was false.

No one disputes the district court's general statement of the legal elements of a

fraud claim under Missouri law. *See, e.g., Slater v. KFC Corp.*, 621 F.2d 932, 936 (8th Cir. 1980). The district court analyzed Counts III and IV as essentially one claim and ruled that UIS could not recover because (1) UIS did not and could not show that Western possessed the requisite knowledge or fraudulent intent, and (2) UIS did not show that it had a right to rely on any expectation that Western may have created nor that it did, in fact, so rely. In arriving at these conclusions, the court emphasized that the oral agreement not to terminate was last expressly reaffirmed in 1978, that it was not a false representation when made and, hence, could not be actionable as fraud. *See Ogilvie v. Fotomat*, 641 F.2d 581, 585 (8th Cir. 1981). Although Western also stresses this point on appeal, it is not in dispute—the fraud claims focus on Western's conduct in the months immediately preceding termination, not upon formation or reaffirmation of the oral agreement in 1978.

Indeed, analysis of the fraud claims has been obfuscated by Western's attempt to recast them as a variation of the oral contract claim. The contract claim, however, is legally distinct from the fraud counts.[6] Our role in reviewing summary judgment on the latter is only to determine whether "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980). Here, there are at least two basic theories of fraud on which UIS has presented submissible jury questions, thereby rendering summary judgment improper.

One theory is based upon the affirmative conduct of Western during the several months immediately preceding the termination. Specifically, UIS asserts that Western, in oral and written communications

---

**6.** There may well be overlap between the recoveries permissible under each theory, if both are proven to a jury's satisfaction. *See, e.g., Walsh v. Ingersoll-Rand Co.*, 656 F.2d 367, 370–371 (8th Cir. 1981); *Smith v. Tracy*, 372 S.W.2d 925, 938–940 (Mo.1963) (both discussing applicability of the benefit-of-the-bargain rule to recovery for fraudulent misrepresentations). The parties and the court, however, can develop instructions which will avoid a double recovery, if such becomes a possibility. The two claims are nonetheless distinct.

during December of 1979, reaffirmed the quality of Eagle's products and the value of continuing their long-term supplier relationship; and in January and February of 1980, solicited Eagle to include its products in Western's advertising catalogue which would be in force at least through the summer of 1980, and solicited Eagle to participate in a Western trade show scheduled for May of 1980. UIS alleges that this conduct was calculated to make UIS expect that its long-standing relationship as primary supplier to Western would continue at least well into 1980; and that creation of such an expectation was knowingly false because Western had, by late 1979, begun a search to replace Eagle and had reached a firm decision to do so by January, 1980. Although the timing of Western's termination decision is disputed, there is sufficient support for UIS's assertions to create a jury question on this issue. In addition, Western's employees certainly knew that UIS had been its primary range supplier for over thirty years, which bears on whether such employees intended their conduct to mislead Eagle as alleged. Thus, quite apart from any issue as to Western's knowledge of the 1978 oral agreement, UIS has presented a colorable claim as to intentional or negligent misrepresentation based upon the affirmative conduct of Western's officers during the several months preceding the abrupt termination.

■ A second fraud theory is based upon Western's passive act of silence—specifically, nondisclosure of its intentions to replace Eagle and concealment for a few months of its firm decision to do so. There is a triable factual dispute as to such concealment, but a threshold consideration is that liability for nondisclosure requires that there be a legal duty to speak. *See, e.g., McMahon v. Meredith Corp.*, 595 F.2d 433, 438–439 (8th Cir. 1980). Here, summary judgment was granted on the conclusory assertion that Western was free to switch suppliers at will and accordingly was under no duty to disclose anything. Under Missouri law, however, a duty to speak may arise where (1) there is a fiduciary relationship between the parties, (2) there is an "inequality of condition" between the parties, or (3) "one party

has superior knowledge not within the fair and reasonable reach of the other party." *Id.* at 439 (citations omitted). Whether these factors give rise to a duty to disclose under particular circumstances is generally a question for the jury. *See Walsh v. Ingersoll-Rand Co.*, 656 F.2d 367, 370 (8th Cir. 1981); *Slater v. KFC Corp., supra*, 621 F.2d at 936–937.

Here, a jury could find that Western had a duty to disclose its intentions, or at least its firm decision to replace Eagle when the latter decision was made. It is clear, for example, that only Western was in a position to know of its search for a replacement manufacturer and its decision to make such a switch. This information obviously would be material to Eagle. A countervailing factor is whether the course of events put Eagle on "inquiry notice," such that its failure to inquire as to Western's plans might absolve Western of any duty to make full disclosures. *See McMahon v. Meredith Corp., supra*, 595 F.2d at 439–441; *Citizens Bank of Windsor v. Landers*, 570 S.W.2d 756, 762 (Mo.App.1978).

■ The district court implicitly recognized the question of "inquiry notice," emphasizing Eagle's awareness that Western, under new management, was embarking on "new directions," changing the methods by which it ordered ranges from Eagle and de-emphasizing its appliance line generally. De-emphasis of its appliance line seems immaterial, however, because Western did not terminate Eagle in order to get out of the business of retailing ranges, but rather to replace them with another manufacturer. The significance of Western's other "signals" is also disputed as a factual matter. Moreover, Missouri law recognizes that "inquiry notice" does not defeat a fraud claim where one party's affirmative representations have led the defrauded party to forego inquiry which it might otherwise have made. *See McMahon v. Meredith Corp., supra*, 595 F.2d at 439 (collecting cases); *see also Cantrell v. Superior Loan Corp.*, 603 S.W.2d 627, 637 (Mo.App.1980) (noting trend toward duty to disclose). Here, Eagle contends that, in light of its long relation-

ship with Western and Western's affirmative conduct during the months preceding termination, Eagle was led to rely on a continued supplier relationship at least into the summer of 1980 and that under such circumstances, it had no duty to ascertain whether Western had contrary intentions—Western, rather, had the duty to disclose its plans and decisions to the extent they were contrary to the reliance Western had engendered. As the foregoing discussion should demonstrate, these are reasonably disputed facts and inferences which present a jury question.

 Both fraud theories—affirmative misrepresentation and nondisclosure under a duty to disclose—are potentially affected by Western's actual or imputed knowledge of the oral agreement. Western contends, and the district court agreed, that none of Western's employees remaining after July, 1979, had any knowledge of such agreement. This appears to be in dispute, however. UIS concedes that the official who reaffirmed the agreement in 1978 was not an employee of Western after July, 1979, but there is support for UIS's assertion that this employee informed at least his then superior, Mr. James Birkhead, of the oral agreement and that Birkhead remained an employee up to the present time. If this assertion is proven, Western certainly cannot disclaim knowledge held by a present employee because other of its employees who dealt with Eagle might have been unaware of the agreement. Apart from this dispute over actual knowledge of present employees, it was error for the district court to rule that, as a matter of law, knowledge of the agreement could not be imputed to Western.

It appears that the oral agreement was first reached in the 1960's and was expressly reaffirmed on at least a few occasions between 1974 and 1978. It was last reaffirmed by Western in 1978. Thus, Western terminated Eagle within approximately two years of expressly reaffirming its six-month notice commitment and within one year of the departure of the employee who directly made such agreement. This is not a situation where a long-departed employee held knowledge of an isolated commitment. In

the light most favorable to Eagle, the evidence shows a rather long-standing agreement, recently reaffirmed. To impute knowledge of such agreement to Western is simply to hold its new employees to have knowledge of the essential characteristics of their supplier relationships—including the recently reaffirmed agreement with Eagle. *See Acme Precision Products, Inc. v. American Alloys Corp.*, 422 F.2d 1395, 1398–1400 (8th Cir. 1970); Restatement (Second) of Agency, § 275, comment (e). For purposes of determining fraud, any adverse inferences from such imputed knowledge would be weighed against evidence, if any, that Eagle's conduct led the new employees to believe that such an agreement did not exist, or by evidence putting Eagle on notice that the agreement was cancelled, rescinded or otherwise not to be relied upon.

In short, Western's actual and imputed knowledge of the oral agreement, as well as other evidence of false representations and any countervailing factors, are simply part of the ultimate jury question on fraud. Each factor gives rise to permissive, not mandatory, inferences on the question of whether, under all the circumstances, Western had a duty to disclose its decisions or affirmatively misled Eagle into an expectation of continued sales along the lines of its prior course of dealings.

The question of actual reliance by UIS is also clearly one for the jury. There is evidence that UIS was seeking to sell or phase out its Eagle division, but there is also evidence that in doing so, it was mindful of what it viewed as notice and related supply obligations to Western. Whether UIS produced a volume of ranges and undertook other steps in reliance on at least the short-term continuation of its relationship with Western is a fact question for determination at trial.

C. *Other Claims by UIS.*

 Counts V and VI of the complaint below focus on Western's disposal of its inventory of Eagle ranges. In the light most favorable to UIS, the relevant facts are that Western anticipated making a total

and prompt switch of products when it terminated Eagle and began marketing another manufacturer's ranges. It therefore contracted with a "dump artist" who agreed to buy such inventory at a discount and who could be expected to, and did, resell the ranges at a discount. In reaching this agreement, Western protected itself by requiring the discounter not to identify Western in connection with any of the resales. The discounter sold the ranges in part through bulk sales advertised in a circular which identified the products as manufactured by Eagle and explained the low price by stating that the discounter bought them from a retailer who had changed brands.

Based essentially on the foregoing, UIS contends that Western is liable for tortious inference with Eagle's business "expectancies" (sales to third parties which were allegedly undermined by the discount sales). UIS also contends the discount resales are actionable for disparaging Eagle's reputation or creating rumors of its collapse. The record support linking Eagle's problems to the manner in which the discount resales were conducted is rather attenuated.[7] Moreover, the legal elements of this claim, at least under Missouri law, include a showing of intentional, malicious or unjustified conduct directed against Eagle's business "expectancies."[8] *See, e.g., Salomon v. Crown Life Ins. Co.,* 536 F.2d 1233, 1238, 1240–1241 (8th Cir. 1976). There has been absolutely no showing of any reason why Western might seek to injure Eagle's other business, much less that it intended to do so. Nor is there any evidence from which it could be inferred that Western's sell-off was "unjustified" in terms of legitimate business motives. Absent any showing that the discount sell-off is actionable under Missouri law, summary judgment on Counts V and VI was proper.

We therefore reverse the summary judgment against UIS on Counts I through IV of its complaint, affirm as to such judgment on Counts V and VI, and remand the case for further proceedings.

---

**7.** This is not to suggest that discount sales are immaterial to UIS's other theories against Western. One of the advantages of the alleged oral agreement regarding notice of termination would be an orderly transition in which both parties might avoid some of the problems of forced liquidations and the like. If Western is found liable for its termination, the direct and foreseeable harm from the manner in which it was conducted might well reach, in whole or in part, the discount resales. We hold only that the discount sell-off is not independently actionable on the theory asserted by UIS.

**8.** We assume without deciding that the injured "expectancies" were sufficiently concrete to form a basis for recovery.